946 P.2d 1

In the Matter of CARL CORPORATION, Petitioner–Appellant,

v.

STATE of Hawai'i, DEPARTMENT OF EDUCATION, Hawai'i State Library System, Respondent–Appellee,

and

Dynix, Inc. dba Ameritech Library Services, Intervenor

No. 20049.

Supreme Court of Hawai'i.

Aug. 22, 1997.

Reconsideration Denied Oct. 20, 1997.

Jeffrey S. Harris and Matt A. Tsukazaki, Torkildson, Katz, Fonseca, Jaffe, Moore & Hetherington, Honolulu, on the briefs, for petitioner-appellant.

John P. Dellera, Deputy Attorney General, on the briefs, for respondent-appellee.

Alan M. Oshima and Lawrence M. Reifurth, Oshima Chun Fong & Chung, Honolulu, on the briefs, for intervenor.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

CARL Corporation (CARL), the unsuccessful competitor for the contract to provide automation and other services to the Hawai'i State Public Library System (HSPLS or the Library), appeals from the decision of the Department of Commerce and Consumer Affairs (DCCA) Hearings Officer. The Hearings Officer essentially rejected CARL's contention that Intervenor Dynix, Inc., dba Ameritech Library Services (Ameritech, Dynix, or ALS), who was awarded the contract, was afforded an unfair advantage in responding to the Library's request for proposals, but concluded that the process by which the proposals were evaluated was in violation of the State Procurement Code, Hawai'i Revised Statutes (HRS) Chapter 103D (1993) (the procurement code or the Code). In his "Findings of Fact, Conclusions of Law and Final Order," filed on August 15, 1996 (FOF, COL, and Order), the Hearings Officer remanded the matter back to the Library to reevaluate the competing proposals, "after which [the Library] shall ratify and affirm the contract, or terminate the contract as provided for in HRS § [§ ] 103D-707(1)(A) and (B)." CARL timely appealed.

For the reasons stated below, we vacate the Hearings Officer's Order remanding to the Library for (1) a reevaluation of the proposals and (2) a determination whether to ratify or terminate the disputed contract. We hold that, pursuant to HRS § 103D-701(g) and because the evaluation of the proposals was in violation of the procurement code, CARL is entitled to its costs in preparing its proposal. We further hold that, where CARL was deprived of any meaningful relief under the code by the award of the contract to Ameritech in *bad faith* violation of the code, CARL is entitled to recover its attorneys' fees incurred in successfully challenging the award of the contract before the Hearings Officer and on appeal.

Accordingly, we remand to the Hearings Officer for entry of an order: (1) awarding CARL its costs for preparation of its proposal and its reasonable attorneys' fees in prosecuting its protest and appeal; and (2) ratifying or terminating the contract as provided for in HRS § 103D-707.

## I. BACKGROUND

CARL and Ameritech submitted the only two responses to the Library's November 13, 1995 Request For Proposals No. RFP-96-004-0 (RFP 96-4) for a new computer automation system. Ameritech was chosen to provide the system after a one-day evaluation of the two voluminous and highly technical proposals. The Library notified CARL by letter dated December 19, 1995, postmarked December 27, 1995, and received January 2, 1996, that another vendor's proposal was selected.

By letter dated January 3, 1996, and copied to State Librarian Bartholemew Kane, CARL lodged its formal protest with Lloyd Unebasami, Administrator of the State Procurement Office, pursuant to HRS § 103D-701, which provides:

(a) Any actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or award of a contract may protest to the chief procurement officer or the head of a purchasing agency. The protest shall be submitted in writing *within five working days* after the aggrieved person knows or should have known of the facts giving rise thereto.

(b) The chief procurement officer, the head of a purchasing agency, or a designee of either officer, prior to the commencement of an action in court concerning the

controversy, may settle and resolve a protest of an aggrieved bidder, offeror, or contractor, actual or prospective, concerning the solicitation or award of a contract. This authority shall be exercised in accordance with rules adopted by the policy office.

(c) If the protest is not resolved by mutual agreement, the chief procurement officer, the head of a purchasing agency, or designee of either officer shall promptly issue a decision in writing. The decision shall:

   (1) State the reasons for the action taken; and

   (2) *Inform the protestor of the protestor's right to review as provided in this part.*

(d) A copy of the decision under subsection (c) shall be mailed or otherwise furnished immediately to the protestor and any other party intervening.

(e) A decision under subsection (c) shall be final and conclusive, unless fraudulent, or any person adversely affected by the decision commences an administrative proceeding under section 103D–709.

(f) In the event of a timely protest under subsection (a),*no further action shall be taken on the solicitation or the award of the contract until the chief procurement officer,* after consultation with the head of the using agency, or the head of the purchasing agency, *makes a written determination that the award of the contract without delay is necessary to protect the substantial interests of the State.*

(g) In addition to any other relief, when a protest is sustained and the protesting bidder or offeror should have been awarded the contract under the solicitation but is not, then the protesting bidder or offeror shall be entitled to the reasonable costs incurred in connection with the solicitation, including bid preparation costs other than attorney's fees.

(Emphases added.) The essence of CARL's protest was that "this was not an open procurement and that another vendor was predetermined from the outset." In support of

its contention, CARL stated the following: (1) the evaluation was inadequate; (2) CARL was not given an opportunity to demonstrate its system; and (3) the implementation schedule proposed in the RFP was unrealistic and could only be achieved by a vendor who had received information not contained in the RFP.

Although, as discussed *infra*, CARL mistakenly identified Unebasami as the "chief procurement officer" with authority to resolve protests pursuant to HRS § 103D–701,[1] Unebasami did nothing to correct CARL's error. He referred CARL's protest to Kane and requested that Kane "draft a response for my signature by January 10, 1996." Unebasami also informed Kane that, pursuant to Hawai'i Administrative Rules (HAR) § 3–126–5, "your agency shall not award the contract until the protest has been settled, unless I make a written determination after consulting with you, that the award is necessary to protect substantial interests of the State."

Kane, however, responded directly to CARL by letter dated January 9, 1996, denying the protest. Kane denied the protest on the grounds that: (1) the protest was untimely; (2) "the independent evaluation committee conducted a full and complete review of the two proposals"; (3) a demonstration was not necessary and was not required by law; and (4) the implementation schedule outlined in the RFP "was an essential specification that was an integral part of the RFP." Kane denied that the Library provided any vendor with information that was not in the RFP or that any vendor was authorized by the Library to initiate any act regarding the implementation of the system prior to the award. Kane's letter did not inform CARL of its right to a review of the denial of its protest as required by HRS § 103D–701(c)(2).

CARL received Kane's letter denying its protest on January 12, 1996. On January 22, CARL wrote to Unebasami, seeking "a detailed explanation of which aspects of the evaluation criteria favored the other party

---

1. HRS § 103D–203 specifies that the chief procurement officer for the Department of Education, to which the Library is administratively attached, is the superintendent of education. *See* section II.B.2., *infra*.

and why." Unebasami responded to CARL's letter on January 26, stating that CARL's letter would be discussed with Kane "in order to prepare a response to you at the earliest possible date." In the meantime, however, Kane executed the contract with Ameritech on January 25, 1996.

By memorandum dated January 30, Unebasami referred CARL's January 22 letter to Kane and informed Kane that his previous response to CARL, denying its protest as untimely, was improper. Unebasami requested that Kane prepare a response to CARL's letter and submit a draft to the State Procurement Office before finalizing and sending it to CARL's attorneys. CARL was to be advised in the response that the contract had already been signed with Ameritech and that the entire contract file was open for public inspection pursuant to HAR § 3–122–58.[2]

On January 31, CARL filed a request for hearing with the DCCA, seeking review of Kane's January 9, 1996 denial of its protest. The request for hearing was made pursuant to HRS § 103D–709, which provides:

(a) The several hearings officers appointed by the director of the department of commerce and consumer affairs pursuant to section 26–9(f) shall have jurisdiction to review and determine de novo any request from any bidder, offeror, contractor or governmental body aggrieved by a determination of the chief procurement officer, head of a purchasing agency, or a designee of either officer under sections 103D–310, 103D–701, or 103D–702.

(b) Hearings to review and determine any request made pursuant to subsection (a) shall commence within twenty-one calendar days of receipt of the request. The hearings officers shall have power to issue subpoenas, administer oaths, hear testimony, find facts, make conclusions of law, and issue a written decision which shall be final and conclusive unless a person or governmental body adversely affected by the decision commences an appeal in the supreme court under section 103D–710.

(c) The party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The degree or quantum of proof shall be a preponderance of the evidence. All parties to the proceeding shall be afforded an opportunity to present oral or documentary evidence, conduct cross-examination as may be required, and argument on all issues involved. The rules of evidence shall be strictly adhered to.

(d) The hearings officers shall ensure that a record of each proceeding [is compiled]. . . .

(e) No action shall be taken on a solicitation or an award of a contract while a proceeding is pending, if the procurement was previously stayed under section 103D–701(f).

(f) Hearings officers shall decide whether the determinations of the chief procurement officer or the head of the purchasing agency, or their respective designees were in accordance with the Constitution, stat-

---

2. HAR § 3–122–58, which became effective December 15, 1995, provides that:

(a) After the contract is signed by all parties, the proposal, except those portions for which an offeror has made a written request for confidentiality, shall be open to public inspection.
(b) The contract file, including but not limited to the following, shall be opened for public inspection:
(1) The register of proposals prepared pursuant to section 3–122–52;
(2) A listing of all vendors to whom copies of the request for proposals were distributed;
(3) Name of successful offeror and dollar amount of offer;
(4) The basis on which the award was made;
(5) A copy of the request for proposals;
(6) A copy of the successful offeror's proposal;
(7) A copy of the unsuccessful offeror's proposal.
(c) If a person requests disclosure of data, for which an offeror has made a written request for confidentiality, the head of the purchasing agency or a designee shall consult with the attorney general or corporation counsel and make a written determination in accordance with chapter 92F, HRS.
(d) When a purchasing agency denies a person access to a state procurement record, the person may appeal the denial to the office of information practices in accordance with section 92F–42(12), HRS.

utes, regulations, and the terms and conditions of the solicitation or contract.

(g) The policy office shall adopt such other rules as may be necessary to ensure that the proceedings conducted pursuant to this section afford all parties an opportunity to be heard.

Also on January 31, CARL wrote to Kane requesting access, pursuant to HRS ch. 92F and HAR § 3–122–55(b)[3], to the Library's records regarding RFP 96–4 and the subsequent award of the contract.

Unebasami informed CARL by letter dated February 1 that its request for hearing was premature because CARL's January 22 letter "is considered a request for reconsideration[.]" Also on February 1, Deputy Attorney General Winfred Pong telephoned CARL's attorney, Jeffrey Harris, on behalf of the Library. According to Harris's February 2 letter to Pong, confirming the telephone conversation, Pong had informed Harris that "Lloyd Unebasami concluded CARL Corporation's January 2, 1996, protest has not been denied, that Mr. Unebasami is making the decision on CARL's protest, that he has requested [Kane's] response to the allegations, and that he has prevented any contract from being sent out for signature yet." Pong had also informed Harris "that the Library System and Ameritech were performing work related to the request for proposals regardless of CARL's protest." Harris pointed out that any performance on the contract was in violation of HRS § 103D–701(f) and requested that Pong "advise the Library System and Ameritech to stop performing any work related to the contract unless and until the protest is finally resolved." Harris sent a copy of the letter to Unebasami.

On February 6, in a letter to Unebasami, CARL formally protested the performance of any work on the contract by the Library and Ameritech, alleging that such performance was in violation of HRS § 103D–701(f). Also on February 6, Kane requested by memo that Unebasami approve the award of the contract to Ameritech. Kane's memo argued that: (1) the current vendor, whose contract

expired in June 1995, might suddenly cease service at any time; (2) the new system would allow redeployment of fifteen library employees currently involved in maintaining the old system; (3) without the immediate award of the contract, the simultaneously awarded contracts for collections (Baker & Taylor) and on-line serials (Information Access Company) would be delayed; (4) free Internet access would be delayed; (5) recabling the libraries and installation of the frame relay system were underway and would have to be paid for when complete, regardless of whether the automation services were available; and (6) new administrative rules to provide services and user fees were dependant on the new automation system for implementation. Kane urged Unebasami that, "given this information, we hope that you will understand the utmost urgency of awarding this contract and give us permission to do so." Kane sent Unebasami an addendum to the February 6 memo on February 9, in which he contended that the fact that the proposals were scored by an independent evaluation team was an additional reason "why the substantial interests of the State will be protected by awarding the contract to Ameritech[.]"

The Library informed Ameritech by letter dated February 8, 1996, that it should immediately cease any action that would result in providing goods and services to the Library under RFP 96–4. On the same date, Kane sent another letter to Ameritech. This letter was in response to Ameritech's fax the previous day, which informed Kane that "March 4 is no longer a realistic functionality date. Due to the delays, this will postpone the functionality date till [sic] April 15." Notwithstanding the order to stop work, which was not mentioned, Kane responded that "[y]our telefacsimile of February 7, 1996 was disappointing and unacceptable. It is imperative for Ameritech as well as the HSPLS to meet a Monday, March 4, 1996 functionality deadline."

On February 12, CARL filed an "Emergency Motion for Order Stopping Work

---

**3.** HAR § 3–122–55(b) was a draft regulation. For the text of HAR § 3–122–58 (1995), which became effective one month prior to CARL's information request, *see supra* note 2.

with Other Vendor On RFP No. 96–004–0" with the Hearings Officer. CARL alleged that, despite its February 6 protest and the Library's statement that it requested Ameritech to cease performing work on the contract, "CARL has been informed by an employee of the Library who fears retaliation that Library employees have been instructed to continue working with the other vendor on the RFP[,]" and that, "[i]n a telephone conversation on the morning of February 12, 1996, Mr. Pong admitted that some of these [tasks related to the contract] were occurring." CARL apparently withdrew its emergency motion when, also on February 12, Pong confirmed his assertion that work had stopped on all data conversion from the old system to the Dynix system and on terminating the cabling. The following day, Harris requested that Pong have the library comply with CARL's January 31 information request.

By memorandum to Unebasami, dated February 16, Kane reiterated his February 6 request that Unebasami approve the award of the contract to Ameritech and make the determination, as required by HRS § 103D–701(f), "that the award of the contract without delay is necessary to protect the substantial interests of the State." In addition to his earlier arguments, Kane asserted that the Library was likely to prevail on the merits of CARL's protest.[4] Kane concluded that "we believe that when the public welfare and interests of the HSPLS are balanced against the CARL Corporation, the interests of the HSPLS must prevail," contending that:

> The HSPLS cannot function without the automation system. Without the immediate award of the contract, approximately 800,000 library cardholders would have no library access or services[,] approximately 512 library employees will face layoff and loss of employment, and the State's eco-

nomic and education systems would be drastically impacted.

On February 17, CARL filed an additional protest with Unebasami, alleging that Ameritech's proposal was not responsive to the RFP because there were material deviations from the RFP that affected the price, quantity, and quality of the goods and services offered. CARL supplemented its protest by letter dated February 20, enumerating the material differences between the requirements of the RFP and the terms of the proposed contract.[5] On February 22, Unebasami informed CARL by letter that its additional protest would delay any response to its January 22 request for reconsideration and requested further explanation of the material deviations between the RFP, CARL's proposal, and the proposed Ameritech contract enumerated in CARL's February 20 letter. CARL provided the requested information on March 1, 1996.

On March 12, Kane denied all three of CARL's protests. Kane denied CARL's January 22 request for reconsideration of his January 9 denial on essentially the same bases as the original denial. The February 6 protest of the performance of work under the contract in violation of HRS § 103D–701(f) was denied on the ground that the Library did not know, at the time it executed the Ameritech contract, that the protest was not yet resolved because Unebasami did not forward CARL's "request for reconsideration" to Kane until February 1. Further, Kane asserted that any work performed by Ameritech after the contract was executed on January 25[6] was performed at Ameritech's own risk and cost and that work that did involve the expenditure of public funds, *i.e.,* the cabling work and the frame relay system were non-vendor specific and "would be required upon the installation of an automation system

---

4. Of course, at the time the memo was drafted, the merits of CARL's protest were still before Kane, whose decision on the protest, pursuant to HRS § 103D–701, had been pending for a month. Despite the purported urgency in proceeding with work on the contract, Kane waited another month before denying the protest, on the same grounds cited both in his initial January 9 denial and in his memo to Unebasami.

5. CARL had obtained a copy of the contract proposed by Ameritech and executed by Ameritech on December 28, 1995. CARL's copy did not reflect the January 25 execution by Kane, and CARL was apparently unaware that the contract had, in fact, been executed.

6. This statement was apparently the first notice to CARL or its attorneys that the contract with Ameritech had been executed.

by any vendor." The February 17 protest was denied "primarily because the protest has failed to compare Ameritech's actual proposal submitted on December 13, 1995, with the RFP No. 96–004–0." [7]

The following day, March 13, Unebasami sent Kane a memo that stated, without further explanation, that, "[p]ursuant to Section 103D–710(f) and based upon our review, it has been determined that the award of the contract to Ameritech without delay is necessary to protect the substantial interests of the State." Also on March 13, Unebasami wrote to Harris and explained that:

As CARL's protest has been determined to be timely, the CPO's function here is then to determine whether an award without delay is necessary to protect the substantial interests of the State. As part of the determination process, our office reviewed your allegations and all of the information submitted to date. Our office looked closely at the RFP's requirements and the evaluation process which was undertaken for this contract. We found that the evaluation process was not compromised and the determination of award reached fairly and in accordance with the RFP.

Accordingly, after careful consideration of the allegations, the available materials, and RFP, we have concluded that to authorize the Hawaii State Library System to proceed with its contract with Ameritech is necessary to protect the substantial interests of the State.

On March 19, 1996, CARL filed a Request for Hearing with the Office of Administrative Hearings, pursuant to HRS § 103D–709, concerning Kane's decision. CARL filed an additional Request for Hearing on March 21, 1996, seeking review of Unebasami's decision that further action on the contract was necessary to protect the substantial interests of the State. The following day, CARL filed an "Emergency Motion for Order Stopping Work on RFP No. 96–004–0." The motion was heard and orally denied on April 2, 1996. FOF 282.[8]

Ameritech's motion to intervene was filed on April 9, 1996 and granted on April 12. The evidentiary hearing before Senior Hearings Officer Rodney A. Maile commenced on April 17, 1996. The issues, as framed in CARL's prehearing statement, were:

1. Did the Hawaii State Public Library System ("HSPLS") consult with Ameritech Library systems ("ALS") about its computer scheme before requesting a proposal from Carl Corporation ("CARL") on November 13, 1995, and receiving it on December 13, 1995?

2. Did HSPLS provide ALS information about this scheme that it did not provide to CARL before December 19, 1995?

3. Did HSPLS consider ALS's information about the networks and systems covered by the scheme that it did not request from CARL?

4. Did ALS's proposal about these networks and systems comply with the Request for Proposals given to CARL on November 13, 1995?

5. Did HSPLS and ALS sign the contract on January 25, 1996, and continue to work

---

7. Kane did not explain how CARL could have done so, where CARL did not have Ameritech's proposal due to the Library's failure to respond to any of CARL's information requests. *See* FOF 248 ("Mr. Kane did not produce documents and information in response to this [January 31, 1996] request or as directed by the State Procurement Office") and Harris' affidavit attesting that he received no response to his January 31 and February 13 information requests until after the protest was denied on March 12; *see also* Library's memorandum in opposition to CARL's motion in limine, stating that "a copy of [Ameritech's] proposal was provided to Petitioner *as soon as a final determination was made* that [Ameritech] was the successful offeror, that it was properly awarded the contract, and that its

proposal included no confidential information." (Emphasis added.)

Moreover, Unebasami's February 22 request for information specifically requested that CARL provide, with respect to each of the alleged material deviations referred to in its February 20 letter,

the page and item number, a quote of the specific language or numbers, and an explanation of the deviation(s), etc., for:
a. The request for proposal (96–004–0);
b. CARL Corporation's offer; and
c. Ameritech's contract.

8. The audiotape of the April 2, 1996 hearing is included in the record, but is inaudible and was apparently not transcribed.

after CARL submitted its protest on January 2, 1996?

6. Was continuing work after March 13, 1996, necessary to protect a substantial interest of the State?

7. Whether HSPLS violated state procurement laws in its award of the automation system contract to ALS, requiring the rescission of the contract?

8. Whether CARL is entitled to an award of the contract or the rebidding of the contract, and its costs in preparing its bid proposal and its attorneys' fees and costs incurred in this protest?

The Hearings Officer issued his FOF, COL, and Order on August 15, 1996. He made 282 FOF, which are not disputed on appeal. The FOF, record, and exhibits recount the history of this procurement and the relationship between Ameritech, its subcontractor, Maui High Performance Computing Center (MHPCC), and the Library, and indicate the following sequence of events.

Sometime in 1994, the Library began looking at major changes in its operations. It was apparently experiencing difficulties with its existing computer system and, as a result of budget cuts, was considering "outsourcing" computer services. The Library also wanted to provide free Internet access to the public, and, in November 1994, State Librarian Bart Kane had discussions with MHPCC about providing this service as well as shifting the Library's other computer functions to MHPCC. To achieve these objectives, the Library would need to replace its existing network with a frame relay network. Under an educational initiative plan announced by GTE–Hawaiian Tel (GTE), GTE offered a $2000 credit to each public library for installation and monthly service fees on the frame relay network. The credit was not available to vendors.

Correspondence memorializing those discussions and formalizing the relationship between the Library and MHPCC was exchanged in early 1995, preliminary to a Memorandum of Understanding (MOU).[9] The letters indicate that the Library and MHPCC contemplated a partnership between MHPCC, GTE, and the Library with the objectives of: (1) Internet access for the Library through MHPCC and GTE's educational initiatives; and (2) migration of the Library's computer systems to MHPCC.

Meanwhile, also in November 1994, an Ameritech representative attended the Hawai'i Library Association Conference, and, while in Hawai'i, met or spoke with representatives of both the Library and MHPCC. Brad Whittle, a sales manager for Ameritech, followed up on the contacts made at the conference, and, in February 1995, discussed with Library personnel the possibility of locating an automation system for the Library at MHPCC. Between January and March 1995, Ameritech sent the Library several price quotes on a computer automation center.

In March or April 1995, the Library initiated its re-engineering project and agreed that a MHPCC representative, Mary Ann Bufalini, would sit on the Library's re-engineering committee. In May 1995, MHPCC received an initial contract to commence providing Internet access to the Library; however, in June, MHPCC was notified to put the Internet access activity on hold until the re-engineering project was completed.

During the spring and summer of 1995, Ameritech managed to insert itself into the Library–MHPCC relationship. In June 1995, Kane attended the American Library Conference in Chicago, and he and his wife had lunch with Whittle and Ameritech's president and vice president in one of Ameritech's suites. They discussed the Library's re-engineering project, the use and operation of automation centers, and Ameritech's automation centers. On July 3, 1995, Kane met with MHPCC representatives regarding the re-engineering project. Kane informed MHPCC that the project was moving along faster than expected and that he was ready to form a technical committee to design a new telecommunications network. Another MHPCC representative, Burt Lum, was assigned to this "telecom" committee. Kane also informed MHPCC that he had found a vendor for the computer automation system,

---

9. It is not evident from the record whether the MOU was executed.

Ameritech, and that Ameritech representatives would be in Hawai'i to visit Kane later in the month and would like to visit MHPCC.

During July 1995, the Library's telecom committee and GTE discussed the equipment and configuration of the frame relay system. On July 26 and 28, Library representatives met with MHPCC representatives to discuss the re-engineering program, Internet services, and the automation of the library system. Lum, MHPCC's representative on the telecom committee, left the meetings with the understanding, reflected in his notes, that Ameritech would be performing the work to automate the Library.

Sometime in July or August 1995, Whittle contacted MHPCC to determine whether MHPCC's hardware could run Ameritech's "Dynix" library automation software. On August 2, Whittle informed a library representative that the Library's current computer system was not compatible with, and could not run on, the computer system operated by MHPCC, which is a UNIX based system. Whittle also arranged to visit MHPCC in August, and Kane asked if he could come along.

During the first week of August 1995, there were three meetings involving representatives of the Library, MHPCC, and GTE to discuss the frame relay system, which was intended by the Library to be used for its entire automation system, including Internet access, and was to terminate at MHPCC. The Library asked for information from GTE on the cost of frame relay network work "in preparation [for] an August 30, 1995 meeting." FOF 62. GTE understood that the Library was interested in working with MHPCC and GTE in migrating the frame relay.

On August 10, 1995, the Library wrote to Ameritech, outlining the goals of the re-engineering project. In that letter, the Library informed Ameritech that it was considering a move to MHPCC and that it was looking for products that, unlike its current automation software, could run on MHPCC's hardware. Whittle and another Ameritech representative, Debra Park, visited Hawai'i on August 28 and 29, 1995. At a meeting on August 28, between the Ameritech and Library representatives, Kane provided an update on the re-engineering process, emphasized the importance of re-engineering, and said that nothing would be worse than going through all the effort and not having the process come to fruition. During the same meeting, Whittle offered to prepare a "pre-proposal" for the Library's consideration by mid-September. Another meeting was held that afternoon with technical staff of the Library, who provided details regarding how the current network was set up, including the current cabling.

The following day, Kane went with Whittle and Park to MHPCC for a meeting with MHPCC representatives. The purpose of the meeting was to discuss MHPCC's participation in the Library's re-engineering efforts in order for MHPCC to price its services to the Library and Ameritech. During the meeting, Ameritech learned that its Dynix software could not run effectively on MHPCC's hardware and that, if Ameritech was to use MHPCC, it would have to provide the hardware for MHPCC's personnel to manage. The group discussed Kane's January 2, 1996 deadline for full functionality, which was designed to coincide with the opening of the legislative session. Also at the August 29 meeting, Whittle asked Lum to secure price estimates for the new frame relay system from GTE. Whittle testified that, at the time, he was unaware of any communication between the Library and GTE regarding the pricing and configuration of the frame relay system, although Lum was MHPCC's representative on the Library's committee that had been discussing the matter with GTE.

During the August 28 and 29, 1995 meetings between Ameritech and the Library, they discussed the Library's budget and how much it could spend on the automation system. They also discussed the time line for the installation of the automation system. On August 31, 1995, because he had promised to call and let him know if Ameritech could meet the Library's deadlines, Whittle faxed Kane, indicating that Ameritech could meet a January installation deadline if it began work on the project immediately. In particular, Ameritech needed information

about configuration and peripherals to prepare its proposal.

Also on August 31, 1995, following the August 29 meeting, Margaret Lewis of MHPCC sent a status report on the library project to other staff at MHPCC and identified "Ameritek" [sic] as "the vendor who will be hardware/software provider for this project."

In September 1995, GTE met with a library representative, Heide Miller–Pakvasa, and Lum of MHPCC to discuss specifics of the frame relay system. GTE's account manager, Phylis Morihara, took notes of a conversation between Lum and Pakvasa, reflecting that they discussed Dynix, Ameritech, and Whittle, as well as the time line for RFPs on an automation system.

Also in September 1995, Whittle made available a Dynix demonstration database to Pakvasa and the re-engineering team over the Internet. Pakvasa circulated information to library personnel on how to access the Dynix demonstration program and toured the program herself. Other library staff specifically asked for access to the program.

During September 1995, Ameritech exchanged information with MHPCC in preparation for submission of its pre-proposal. The Library also provided Ameritech with various information necessary for Ameritech's pre-proposal, including: (1) information about the Library's equipment and capacity requirements for the automation system; (2) the number, type, and model number of equipment required by the Library; (3) information about the Library's Automation Inventory; (4) local telephone rates; (5) details about peripheral equipment; (6) on-line equipment existing at the Library; (7) microcomputer data and central site equipment; (8) conversion utilities; (9) information on library sites, number of computers, and speeds by which the circuits would be established to each site; and (10) graphics depicting the various library sites connected to the various frame relay breaks, the work station, router, a DSU/CSU, and terminal server. "The information requested by [Ameritech] and provided by [the Library] was necessary

for [Ameritech's] preparation of its proposal in response to the RFPs."

On September 19, 1995, Whittle faxed Kane a seventy-one page document entitled "Response to a Request for Proposal for a Computer Automation System for HS[P]LS." The pre-proposal contained three possible automation system scenarios and contained information that Ameritech had obtained from MHPCC about the frame relay costs. On September 22, 1995, the Library determined to proceed by request for proposal, rather than invitation for bid, on the purchase the new computer automation system.

Whittle and Park were in Hawai'i and met with representatives of the Library on September 28 and 29, 1995 to discuss Ameritech's pre-proposal. Whittle and Park presented the pre-proposal, discussed the Dynix automation center, answered questions, and received feedback on the pre-proposal in a meeting with Kane and two other Library staff on the morning of September 28. During the meeting, the Library staff discussed the Library's budget restrictions and its budget range for the automation center. The group also discussed the January 2, 1996 deadline, which was of critical importance to Kane. Kane asked whether it was possible to have the system installed and operational by then. Whittle called Ameritech's headquarters and, after speaking to several people, confirmed with Kane that Ameritech could meet the January 2 deadline.

There was another meeting that afternoon, including the same participants from the morning session, with the addition of Lum and Bufalini of MHPCC, at which the discussion centered around Ameritech's relationship with MHPCC and the frame relay system. The following day, the same group met again, joined by Kane's wife, Elaine Murphy. The purpose of the meeting was to discuss the RFP process. Murphy was present to share her experience with the proposal evaluation process, obtained as a City employee. Kane asked Whittle and Park for information that would help the Library with the RFP process, and Whittle provided the Library a sample RFP. As in the meetings the preceding day, the group discussed what the RFP should include.

On October 2, 1995, the Library issued RFP–96–001–0 for "Sealed Proposals and Pricing for Vendor Operated Automation Center, Integrated Library Automation System, and Frame Relay Telecommunications Network." (RFP 96–1). Prior to the issuance of RFP 96–1, Ameritech took steps in preparation for the installation of its automation system for the Library, including: (1) pre-ordering equipment that would be required for the automation system; (2) starting the process of recovering data from the Library's existing system; (3) trying to start converting information into Ameritech's automation system; and (4) assembling a team of Ameritech's staff to write the responsive proposal, as well as configuration, contract, and implementation teams.

The deadline for the submission of proposals was set in RFP 96–1 as October 23, 1995, with the contract to be awarded on November 1, 1995, and the new system to be operational and in use by January 2, 1996. The ability to implement the contracted services within sixty days of the award of contract was specifically made a "Vendor Qualification."

Before any responsive proposals were received, Kane informed the library's transition team that Ameritech would complete the network design and cabling specifications. Management action plans (MAP) prepared by Pakvasa on or about October 4, 1995 listed as necessary actions: (1) "[f]inalize details with MHPCC"; (2) "[p]repare MHPCC facility"; and (3) "[l]oad software & library data on new equipment in Utah [Ameritech's location]." Under the "person responsible" column of the MAP relating to the frame relay network, "Ameritech" was assigned responsibility for completing the network design and cabling specifications, ordering the equipment for the MHPCC and library sites, and installing and configuring the network equipment. Ameritech was also assigned responsibility for almost all of the tasks related to "[a]utomation—Internet," as well as several tasks related to "[a]utomation—Baker & Taylor." [10]

Only CARL and Ameritech submitted proposals in response to RFP 96–1.[11] On October 30, 1995, Kane informed Whittle by telephone that Ameritech had been awarded the contract under RFP 96–1. On November 8, 1995, however, the Library informed Ameritech and CARL that RFP 96–1 had been canceled because of the failure to publish notice of the RFP.

The Library issued RFP–96–004–0 (RFP 96–4) on November 13, 1995. The schedule of events described in RFP 96–4 required proposals to be submitted by, and opened on, December 13, 1995. The proposals would be evaluated on December 15, 1995, the contract awarded on December 22, 1995, and the new system operational and in use by February 20, 1996. Other than changes in dates and deadlines, the only difference between RFP 96–1 and RFP 96–4 was the removal of the requirement that the vendor provide cabling for the libraries.[12] RFP 96–4, like RFP 96–1, requested proposals for the purchase, installation, and maintenance of the automation system and included a requirement that the automation center's operating system "must be an open system running UNIX."

Again, Ameritech and CARL submitted the only proposals in response to RFP 96–4. Ameritech's proposal included the siting of the automation center at MHPCC and utilized MHPCC for Internet connection. Am-·

---

10. Baker and Taylor's contract to acquire books for the Library was part of Kane's plan to "outsource" library functions.

11. The Library's existing service vendor, Data Research Associates (DRA), withdrew as a possible offeror under RFP 96–1 on October 16, 1995, informing Kane in a letter that it would be impossible to establish an automation center and be operational by the stated deadline and observing that the deadline and other requirements of RFP 96–1 indicated to DRA that the Library had already selected a vendor.

12. Notwithstanding the requirement in RFP 96–1 that the vendor provide cabling, it appears that the Library decided to do the recabling itself to save money. During discussions over Ameritech's September 19 pre-proposal, the Library and Ameritech discussed the high cost of recabling, and the Library began looking for another funding source to cover the cost of recabling. On October 30, 1995, Kane asked Hawaiian Electric Company for the services of a project manager to oversee the cabling work, which was to be done by the Library's technicians.

eritech's proposal provided pricing only for the leasing of the automation system; CARL's proposal provided pricing for both purchase and lease of the system. The automation system proposed by Ameritech runs under a UNIX operating system; CARL's runs on a Tandem operating system and supports a POSIX environment, which is the industry standard UNIX implementation.

The RFP also required the vendor to provide telephone lines and firm pricing for telephone charges. Ameritech's proposal included telephone lines as an option, and its cost proposal excluded telephone charges and provided only an estimate of the annual frame relay charges from GTE, noting that the estimated charges did not include the $2,000 per/library credit offered by GTE.

The RFP required a quote for 550 ports or terminals. Ameritech's response provided for 524 ports, or 515 terminals. CARL's response provided for 550 terminals. Ameritech's proposal stated that Ameritech was "prepared to meet the time schedules outlined. Specifically, [Ameritech] will have a system operational and in use by February 20, 1996." CARL, on the other hand, noted that "[i]mplementation of the [telecommunications] network will need to begin immediately upon contract signing. Typically there are 45–60 day lead times for circuit installation." CARL's implementation schedule, therefore, identified April 10, 1996 as the date for the "live" use of the system and asked the Library to "note that this is a *very aggressive schedule*, and any delays will result in delays in a live system date." (Emphasis in original.)

Members of the Library's re-engineering team created the Proposal Evaluation Worksheets, which were based on the factors listed in the RFP. Out of a maximum of 200 possible points, "Business Profile" was assigned 20 points, "Cost Proposal" was assigned 50 points, "Response to Specifications" was assigned 50 points, "Installation and Training" was assigned 30 points, and "Automation Center Service and Support" was assigned 50 points. Each of these headings was then broken down into subcategories, with the relative importance of each assigned by Library staff. Separate worksheets were prepared for several of the functional specifications and for the cost evaluation. A member of the Library staff calculated the proposals' scores, based on the 30–point total, for "Functional Specifications."

The scores in the remaining categories were calculated by a team of three evaluators, who met for the purpose of evaluating the proposals on December 15, 1995. Each of the evaluators had experience in library automation; two were librarians at libraries utilizing Ameritech automation systems, one was a librarian at a library employing a CARL system. The evaluators were not provided any materials to review prior to December 15, 1995 and were instructed that the Library had no experience with either vendor, so it had no opinion as to which was better. The evaluators were told only to go through the proposals and use the RFP to make their recommendation. The evaluators were not instructed that they could consider only the RFP and the proposals and could not rely on their outside experience in evaluating the proposals. Nor were they instructed on how to use the scoring worksheets and the completed worksheets for "Functional Specifications." Because they were told that they had one day to complete the evaluation, they did not read the entire proposals or check references. The evaluators in fact relied on their own subjective beliefs and their knowledge of the different automation systems proposed and the companies proposing them, in evaluating which automation system was better for the Library.

One of the evaluators did not complete the cost evaluation worksheet because he had to leave early. After he left, the other two evaluators telephoned Ameritech's office in Utah and asked whether, in view of the difference in the cost proposals, there were any additional charges not reflected in Ameritech's total cost. They were told that there were no additional costs. The two evaluators who completed the cost evaluation worksheet did not consider the differing terms of the two proposals. Recognizing that they did not have the capability to perform a comparative evaluation of all the various purchase and lease options, they compared CARL's

purchase option with Ameritech's leasing proposal, rather than comparing CARL's leasing option with Ameritech's leasing proposal. The evaluators also failed to take into consideration the five and one-half year duration of the contract, but compared the costs only for the first year of the contract.

The three evaluators agreed that the deadline prescribed in RFP 96–4 was unrealistic and impossible for vendors to meet. Nonetheless, at least one evaluator scored CARL below Ameritech because some of the items, under CARL's proposal, would become operational only after the February 20, 1996 deadline.

In scoring the two proposals, the evaluation team awarded a total of 443.5 points to Ameritech and 327 points to CARL. Kane accepted the recommendation of the evaluation team and notified Whittle on December 18, 1995 that Ameritech had been awarded the contract under RFP 96–4.

Between December 18, 1995 and January 25, 1996, when Kane executed the contract, there were further negotiations between the Library and Ameritech regarding the terms of the contract. The final contract differed from the RFP in several respects. For example, the RFP required the vendor to provide a frame relay system and telephone lines to the Library. The contract, however, stated that the Library was responsible for all costs of installation and maintenance of all telecommunication lines and frame relay services.

The Hearings Officer entered the following challenged COL:

13. Whereas incomplete contract specifications may be fatal to an I[nvitation]F[or]B[id], they are inherent in the nature of an RFP where the agency is seeking guidance from the bidders as to how the general service it seeks can be provided.

18. [The Library's] preference as stated in the RFP for an automation system which runs a UNIX operating system is not arbitrary or unreasonable, nor does it amount to an abuse of discretion.

19. [The Library's] preference as stated in the RFP for an automation system which runs a UNIX operating system did not significantly favor [Ameritech] over [CARL] in the evaluation of the competing proposals inasmuch as the Worksheets awarded one point out of 200 for a proposal offering a UNIX system.

20. When Mr. Kane denied [CARL's] protest on January 9, 1996, it was not unreasonable for him to believe that pursuant to section 103D–701(e), his decision was final and conclusive.

21. It was also not unreasonable for Mr. Kane to believe that after his final decision was issued on January 9, 1996, and before any administrative proceeding was commenced under HRS § 103D–709, there was no pending protest under HRS § 103D–701(a) that would require that no action be taken on the award of the Contract.

22. The scope of the Hearings Officer's ability to fashion a remedy in the instant case is governed by section 103D–707, concerning remedies after an award.

23. The determination that substantial State interests were involved allowed [The Library] and [Ameritech] to proceed under the Contract despite the pendency of [CARL's] protests.

24. [CARL] did not meet its burden of proving by a preponderance of evidence that the CPO's decision of March 13, 1996, finding that the award of the Contract to Intervenor without delay was necessary to protect the substantial interests of the State despite [CARL's] protest was in violation of the law or violated the Constitution, statutes, regulations, or the terms and conditions of the solicitation.

25. Should the Hearing Officer find that the solicitation or award of the Contract was in violation of the law or that [the Library] violated the Constitution, statutes, regulations, or the terms and conditions of the solicitation, in the absence of any evidence or claim that [Ameritech] acted fraudulently or in bad faith in securing the Contract, the remedies available are limited to ratification or termination of the contract. HRS § 103D–707(1)(a).

26. Should any remedy be appropriate, in order to determine whether the remedy should be ratification or termination, "the

best interests of the State" must be considered. If "the best interests of the State" require ratification, the contract may be ratified notwithstanding a solicitation or award of contract in violation of law.

27. It is beyond the Hearings Officer's authority to award the Contract to [CARL].

28. It is beyond the Hearings Officer's authority to determine "best interests of the State"; consequently, should the solicitation or award of the Contract be determined to be in violation of the law, or should it be determined that [the Library] violated the Constitution, statutes, regulations, or the terms and conditions of the solicitation, the Hearings Officer must remand the matter back to the contracting officer for a determination of "the best interests of the State."

29. The law limits the Hearings Officer's remedy-related authority to "decid[ing] whether the determinations of the chief procurement officer or the head of the purchasing agency ... were in accordance with the Constitution, statutes, regulations, and the terms and conditions of the solicitation."

30. The rules adopted by the CPO in accord with the legislative directive provide only that:

the chief procurement officer or the head of a purchasing agency may ratify or affirm the contract or terminate it in accordance with this section after consultation with the respective attorney general or corporation counsel, as applicable.

31. [CARL] did not prove by a preponderance of the evidence that [the Library] had determined to select [Ameritech's] proposal under RFP 96–4 at any time prior to receiving the independent evaluation team's report of December 15, 1995.

32. [CARL] did not prove by a preponderance of the evidence that, in light of the performance and recommendation of the independent evaluation team, any alleged preference of Mr. Kane for [Ameritech] had any bearing on [the Library's] selection of [Ameritech's] proposal under RFP 96–4.

33. [CARL] did not prove by a preponderance of the evidence that Mr. Kane "rigged" RFP 96–4 so as to make [the Library's] selection of [Ameritech's] proposal more likely.

(Citations omitted.) The Hearings Officer also concluded that:

34. [CARL] proved by a preponderance of the evidence that the evaluation process and the concomitant award of the contract to [Ameritech], *did not comply with HRS § 103D–303(g)*.[13]

In his Order, the Hearings Officer commented that,

although there were numerous meetings and discussions between Mr. Kane, [the Library's] staff, and [Ameritech] representatives, such meetings and discussions in and of themselves, were not prohibited by HRS Chapter 103D. The real focus in this case is whether the evaluation of the proposals from [Ameritech] and [CARL] were in accordance with the procedures outline[d] in RFP–96–4 and the applicable statutes and rules.

The Hearings Officer explained that,

[g]iven the nature and extent of the evidentiary presentations by [Ameritech] and [CARL] regarding the details of their proposals, it would have been unrealistic and unfair to expect the evaluators to understand such details without being provided additional explanations and time.

Even though the efforts of the independent evaluators and [the Library's] staff were undertaken in good faith, as a result of the compounding of misunderstandings between the evaluators and [the Library's] staff, the entire evaluation process became irretrievably flawed.

**13.** HRS § 103D–303(g) provides that:
Award shall be made to the responsible offeror whose proposal is determined in writing to be the most advantageous taking into consideration price and the evaluation factors set forth in the request for proposals. No other factors or criteria shall be used in the evaluation. The contract file shall contain the basis on which the award is made.

Accordingly, the Hearings Officer concludes that [CARL] proved by a preponderance of the evidence that [CARL's] proposal submitted in response to RFP–96–4, did not receive a complete evaluation in comparison with [Ameritech], as required by HRS § 103D–303(g).

Based on his FOF and COL, the Hearings Officer ordered "that the proposals submitted by [Ameritech] and [CARL] in response to RFP–96–4 be remanded back to [the Library] for proper evaluation, after which [the Library] shall ratify and affirm the contract, or terminate the contract as provided for in HRS § 103D–707(1)(A) and (B)."

On August 19, 1996, CARL timely filed an application in this court for judicial review of the Hearings Officer's decision pursuant to HRS § 103D–710, which provides:

(a) Any person or governmental body aggrieved by a final decision of a hearings officer under section 103D–709 may apply for judicial review of that decision. The proceedings for review shall be instituted in the supreme court.

(b) An application for judicial review shall not operate as a stay of the decision rendered under section 103D–709.

(c) Within twenty calendar days of the filing of an application for judicial review in the supreme court, the hearings officer shall transmit the record of the administrative proceedings to the supreme court.

(d) The review shall be scheduled as expeditiously as practicable. It shall be conducted on the record of the administrative proceedings, and briefs and oral argument. No new evidence shall be introduced in the appellate court, except that the court may, if evidence is offered which is clearly newly discovered evidence and material to the just decision of the appeal, admit the same.

(e) Upon review of the record the court may affirm the decision of the hearings officer issued pursuant to section 103D–709 or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if substantial rights may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority or jurisdiction of the chief procurement officer or head of the purchasing agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

CARL contends that the evidence proved that Ameritech was provided an unfair advantage in the bidding process in violation of the procurement code and requests that this court

reverse or modify the Final Order (except as to Conclusion of Law No. 34), and terminate and void the award of the contract to Dynix under RFP–96–004–0, invalidate the proposal submitted by Dynix under RFP–96–004–0, award the contract under RFP–96–004–0 to CARL, award CARL its costs in preparing the proposal, and its attorneys' fees and costs incurred in the protest and on this application for judicial review.

## II. *DISCUSSION*

The standard by which this court reviews the decisions of a hearings officer is governed by HRS § 103D–710(e), which is virtually identical to HRS § 91–14(g) (1993), and provides that

conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and [the Hearings Officer's] exercise of discretion under subsection (6). Accordingly, a reviewing court will reverse [a Hearings Officer's] finding of fact if it concludes that such ... finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. On the other hand, the [Hearings Officer's] conclusions of law are freely reviewable.

*Hardin v. Akiba,* 84 Hawai'i 305, 310, 933 P.2d 1339, 1344 (1997) (citations omitted).

## A. *Jurisdiction*

The Library and Ameritech contend that this court lacks jurisdiction to review the Hearings Officer's decision. They argue that CARL is not a "person aggrieved by a final decision of a hearings officer under section 103D-709" because the Hearings Officer's decision was not final, and CARL may get the relief it seeks when the Library reevaluates the proposals on remand.

They rely on our interpretations of the term "final order" in the context of HRS Chapter 91: " 'Final order' means an order ending the proceedings, leaving nothing further to be accomplished. Consequently, an order is not final if the rights of a party involved remain undetermined or if the matter is retained for further action." *Mitchell v. State, Dep't of Educ.,* 77 Hawai'i 305, 307, 884 P.2d 368, 370 (1994) (quoting *Gealon v. Keala,* 60 Haw. 513, 520, 591 P.2d 621, 626 (1979) (citations omitted)).

Unlike HRS § 91-14(a), however, under which this court has jurisdiction to review "a final decision and order in a contested case," HRS § 103D-710(a) provides jurisdiction to review "a final decision of a hearings officer under section 103D-709." HRS § 103D-712 provides that "[r]equests for judicial review under section 103D-710 shall be filed in the supreme court within ten calendar days after the issuance of a written decision by the hearings officer under section 103D-709."

Pursuant to HRS § 103D-709, "hearings officers shall have power to ... find facts, make conclusions of law, and issue a written decision which shall be final and conclusive unless a person or governmental body adversely affected by the decision commences an appeal in the supreme court under section 103D-710." HRS § 103D-709(b). The "written decision" that the hearings officer has the power, and is, in fact, required, to

make is "whether the determinations of the chief procurement officer or the head of the purchasing agency ... were in accordance with the Constitution, statutes, regulations, and the terms and conditions of the solicitation or contract." HRS § 103D-709(f).

Having made the determination required by HRS § 103D-709(f)—that Kane's denial of CARL's protest and award of the contract to Ameritech were in violation of the procurement code because "the evaluation process and the concomitant award of the contract ... did not comply with HRS § 103D-303(g)," COL 34—and having issued a written decision to that effect, pursuant to HRS § 103D-709(b), that written decision was "final and conclusive" unless appealed.

Nothing in the procurement code or its implementing regulations gives the Hearings Officer authority to remand to the Library for reevaluation of the proposals.[14] Unlike HRS § 103D-710(e), which authorizes this court, on review, to "affirm the decision of the hearings officer issued pursuant to section 103D-709 or *remand the case with instructions for further proceedings;* or ... reverse or modify the decision and order[,]" *id.* (emphasis added), HRS § 103D-709 gives the Hearings Officer jurisdiction to "review and determine de novo any request from any ... offeror ... aggrieved by a determination of the chief procurement officer [or] head of a purchasing agency[,]" and authorizes the Hearings Officers to "issue subpoenas, administer oaths, hear testimony, find facts, make conclusions of law, and issue a written decision" regarding "whether the determinations of the chief procurement officer or the head of the purchasing agency ... were in accordance with the Constitution, statutes, regulations, and the terms and conditions of the solicitation or contract." HRS §§ 103D-709(a),(b) & (f). Presumably because of the obvious need for expeditious review of public contracting decisions,[15] the code simply does

---

**14.** As discussed *infra,* where the determination that the solicitation or award was in violation of law is made *prior* to the award of the contract, one of the remedies is to revise the solicitation or award to comply with the law. HRS § 103D-706(2). Had the contract not been awarded to Ameritech before the Hearings Officer issued his

decision, then remand to the Library for reevaluation of the proposals would have been appropriate under HRS § 103D-706(2). Because the contract was already awarded, this remedy was inapplicable and, obviously, futile.

**15.** We note that, although the Hearings Officer's order remanding to the Library for reevaluation

not authorize the Hearings Officer to remand to the contracting agency under these circumstances. Instead, the Hearings Officers' written decisions are to be "final and conclusive," HRS § 103D–709(b), and any request for judicial review must be filed within ten days of such written decision. HRS § 103D–712(b).

■ Accordingly, we hold that, pursuant to HRS § 103D–709, the Hearings Officer's order remanding the matter to the Library for reevaluation of the proposals was in excess of his statutory authority, and we reverse that portion of the decision. We further hold that, pursuant to HRS § 103D–710, this court has jurisdiction to review the Hearings Officer's decision.

### B. *Remedies Under the Procurement Code*

Ultimately, the Hearings Officer's decision was that the award of the contract to Ameritech was in violation of HRS § 103D–303(g). In other words, the Hearings Officer decided in CARL's favor. Nonetheless, CARL requests review of the Hearings Officer's other conclusions that, essentially, there were no other violations of the procurement code. CARL's appeal from a favorable decision, its requested relief, and the arguments in its briefs make clear that this appeal is an attempt to obtain relief beyond that afforded by the Hearings Officer. Although we agree with CARL that the violations of the procurement code were not limited to the faulty evaluation of the proposals, the number of violations of the procurement code has no bearing on the remedies available. Therefore, rather than address the Hearings Offi-

cer's conclusions on each alleged violation, we discuss only those necessary to determine CARL's remedy.

Unlike the American Bar Association's Model Procurement Code for State and Local Governments (ABA Model Code), after which it was modeled, *see* Stand. Comm. Rep. No. S8–93, in 1993 Senate Journal at 39, or, apparently, any other jurisdiction's procurement code, the State Procurement Code provides that

> [t]he procedures and remedies provided for in this part, and the rules adopted by the policy office, shall be the exclusive means available for persons aggrieved in connection with the solicitation or award of a contract, ... to resolve their claims or differences. The contested case proceedings set out in chapter 91 shall not apply to protested solicitations and awards[.]

HRS § 103D–704.[16]

The "remedies" available to a person aggrieved in connection with the solicitation or award of a contract are described in HRS §§ 103D–705 to 103D–707. HRS § 103D–705 provides that "[t]he provisions of section 103D–706 and section 103D–707 apply where it is determined administratively under sections 103D–701, ... and 103D–709, or upon judicial review or action under section[ ] 103D–710 ..., that a solicitation or award of a contract is in violation of the law." Sections 103D–706 and 103D–707 provide:

> [§ 103D–706] **Remedies prior to an award.** If prior to award it is determined that a solicitation or proposed award of a contact is in violation of law, then the solicitation or proposed award shall be:

of the proposals was issued on August 15, 1996, and "[a]n application for judicial review shall not operate as a stay of the decision rendered under section 103D–709[,]" HRS § 103D–710(b), as of December 1996, when briefing was completed, the reevaluation had not yet occurred, and there is no indication that it has occurred since.

16. Section 9–401 of the ABA Model Code, "Waiver of Sovereign Immunity in Connection with Contracts," authorizes judicial, as well as administrative, actions challenging the solicitation or award of contracts, and provides in part:

> (1) **Solicitation and Award of Contracts.** The [designated court or courts of the State] shall have jurisdiction over an action between the

[State] and a bidder, offeror, or contractor, prospective or actual, to determine whether a solicitation or award of a contract is in accordance with the Constitution, statutes, regulations, and the terms and conditions of the solicitation. The [designated court or courts of the State] shall have such jurisdiction, whether the actions are at law or in equity, and whether the actions are for monetary damages or for declaratory, injunctive, or other equitable relief.

*Id.* (brackets in original). Section 9–401 of the ABA Model Code was omitted from the State Procurement Code and replaced with HRS § 103D–704, *supra*.

(1) Cancelled; or

(2) Revised to comply with the law.

[§ 103D–707] **Remedies after an award.** If after an award it is determined that a solicitation or award of a contract is in violation of law, then:

(1) If the person awarded the contract has not acted fraudulently or in bad faith:

(A) The contract may be ratified and affirmed, provided it is determined that doing so is in the best interests of the State; or

(B) The contract may be terminated and the person awarded the contract shall be compensated for the actual expenses reasonably incurred under the contract, plus a reasonable profit, prior to the termination;

(2) If the person awarded the contract has acted fraudulently or in bad faith:

(A) The contract may be declared null and void; or

(B) The contract may be ratified and affirmed if the action is in the best interests of the State, without prejudice to the State's rights to such damages as may be appropriate.

In making the determination whether ratification of the contract is in the best interest of the State, the following factors are among those considered:

(A) The costs to the State in terminating and resoliciting;

(B) The possibility of returning goods delivered under the contract and thus decreasing the costs of termination;

(C) The progress made toward performing the whole contract; and

(D) The possibility of obtaining a more advantageous contract by resoliciting.

HAR § 3–126–38(a)(4).

Thus, the award of the contract before it has been determined whether the solicitation or proposed award is in violation of law effectively limits the relief available to the person aggrieved by the solicitation or award. Where the contract has not yet been awarded, it is still possible to cancel the solicitation and proposed award, or to correct the violation. Once the contract has been awarded, whether or not it is in violation of law, and notwithstanding the prejudice to the aggrieved person or the public, the contract may still be ratified, providing it is "in the best interests of the State." Moreover, the further performance on the contract has proceeded, the more likely it is, given the applicable factors, that ratification of the contract is "in the best interests of the State," effectively eliminating any remedy, either to the public or the protestor, from an illegally entered contract.

1. *Execution of the Ameritech contract*

This case provides an example of the difference in available remedies once the contract has been awarded. CARL contended before the Hearings Officer, and maintains on appeal, that Ameritech's proposal should not have been considered because (1) it was not responsive to the RFP, and (2) Ameritech was disqualified from submitting a proposal due to its participation in developing the specifications for the RFP.[17] The Hearings Officer did not address these issues, presumably because of his conclusion that "the real focus of this case" was the evaluation procedures. CARL urges us to reach these issues on appeal because it contends that, where Ameritech's proposal was nonresponsive or Ameritech was precluded from

**17.** HRS § 103D–405(d) provides that:
Outside contractors may be utilized to prepare specifications and work statements in the development of a solicitation. Contractors paid for those services shall be precluded from bidding on or receiving a contract when they participated in any way in the development of the solicitation package or any resulting contract.
Although the legislature apparently did not contemplate the situation where a prospective con-

tractor is involved in the preparation of specifications without pay, the identical concern is raised: "In such cases the concern is that the firm could either skew competition in favor of itself when developing the terms of the procurement, or, through its inside knowledge of the agency's requirements, gain an unfair advantage in the competitive bidding process." *Medco Behavioral Care Corp. of Iowa v. State Dep't of Human Servs.,* 553 N.W.2d 556, 565 (Iowa 1996) (explaining analogous federal regulation) (citation omitted).

bidding, this court may disqualify Ameritech's proposal and award the contract to CARL, the only remaining responsive offeror.

Had the contract not been executed, the relief CARL seeks would have been available. If the Hearings Officer had agreed with CARL, prior to the award of the contract, he could either have ordered the cancellation of the solicitation and precluded Ameritech from submitting a proposal on any subsequent solicitation based on the same specifications or have revised the solicitation to comply with law by eliminating Ameritech's proposal from consideration, which would have had the same effect. HRS § 103D–706.[18] Because the contract had already been executed, however, even if the Hearings Officer or this court agreed that Ameritech's proposal should not have been considered, the only remedy available is ratification or termination of the contract pursuant to HRS § 103D–707, not the award of the contract to CARL as the only responsive, qualified offeror.

■ Because the award of the contract so severely limits the relief available, HRS § 103D–701(f) provides that,

[i]n the event of a timely protest [to the chief procurement officer or the head of a purchasing agency] under subsection (a), *no further action shall be taken on the solicitation or the award of the contract* until the chief procurement officer, after consultation with the head of the using agency, or the head of the purchasing agency, makes a written determination that the award of the contract without delay is necessary to protect substantial interests of the State.

(Emphasis added.) In this case, however, Kane executed the contract with Ameritech on January 25, 1996; there was no "substantial interest" determination made until March 13, 1996. We hold, therefore, that the award of the contract to Ameritech was in violation of HRS § 103D–701(f). Moreover, the record establishes as a matter of law that Kane's execution of the contract was in bad faith.

CARL's timely protest was received on January 3, 1996. Unebasami instructed Kane on January 4 not to award the contract to Ameritech unless he, Unebasami, issued a substantial interest determination, and further instructed Kane to draft a reply for his signature. Kane proceeded to deny the protest directly, without Unebasami's review, on January 9. CARL received the denial on January 12 and timely filed a request for reconsideration on January 22; Kane executed the contract with Ameritech on January 25. The Hearings Officer "concluded" that, "[w]hen Mr. Kane denied [CARL's] protest on January 9, 1996, it was not unreasonable for him to believe that pursuant to section 103D–701(e), his decision was final and conclusive[,]" COL 20, and that

[i]t was also not unreasonable for Mr. Kane to believe that after his final decision was issued on January 9, 1996, and before any administrative proceeding was commenced under HRS § 103D–709, there was no pending protest under HRS § 103D–701(a) that would require that no action be taken on the award of the Contract.

COL 21. COL 20 and 21 are actually findings of fact, and, therefore, reviewed under the "clearly erroneous" standard.[19]

We hold that the finding that Kane acted reasonably is "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." HRS § 103D–710(e)(5). Notwithstanding HRS § 103D–701(e), which provides in part that "[a] decision under subsection (c) shall be final and conclusive[,]" the implementing regulations specifically provide for reconsideration of the

---

18. Even if he disagreed with CARL's contentions regarding the disqualification of Ameritech's proposal, the Hearings Officer's conclusion that the evaluation of the proposals was not in compliance with the Code would have required him to cancel the solicitation or revise it to comply with law, had the contract not been executed. In that case, his remand for a proper evaluation would have been appropriate.

19. The Hearings Officer failed to enter any COL regarding whether Kane's January 25 execution of the contract was in violation of HRS § 103D–701(f), which is dependent on compliance with the terms of the statute, rather than on Kane's state of mind.

decision of the chief procurement officer or the head of the purchasing agency and treat the decision after reconsideration as the "final decision" rendered pursuant to HRS § 103D–701. HAR § 3–126–8 (1995) provides:

> *Request for Reconsideration.* (a) Reconsideration of a decision of the chief procurement officer or the head of a purchasing agency may be requested by the protestor, appellant, any interested party who submitted comments during consideration of the protest, or any agency involved in the protest. The request for reconsideration shall contain a detailed statement of the factual and legal grounds upon which reversal or modification is deemed warranted, specifying any errors of law made or information not previously considered.
>
> (b) Requests for reconsideration of a decision of the chief procurement officer or the head of a purchasing agency *shall be filed not later than ten working days after receipt of such decision.*
>
> (c) A request for reconsideration shall be acted upon as expeditiously as possible. The chief procurement officer or the head of a purchasing agency may uphold the previous decision or reopen the case as such officer deems appropriate.
>
> (d) The decision under subsection (c) shall be final and the protesting bidder or offeror shall be informed:
>
> (1) Whether the protest is denied or sustained; and
>
> (2) If the protest is denied, the protestor's right to an administrative proceeding pursuant to subchapter 5.
>
> (e) The protesting bidder or offeror shall inform the State within five working days after the final decision if an administrative appeal will be filed. An appeal shall be filed within seven calendar days of

the determinations under ... this section[.]

(Emphasis added.) Even if, as the Hearings Officer implicitly found, Kane was unaware of CARL's January 22 request for reconsideration when he executed the contract on January 25, the period during which such a request could be filed had not yet expired. Pursuant to HAR § 3–126–8(b), CARL had until January 26, 1996, to file its request for reconsideration. Therefore, it was not reasonable for Kane to believe, on January 25, that his denial of the protest was final and conclusive and that there was no pending protest that would require him to suspend any further action.

The Hearings Officer implicitly concluded that Kane should not be charged with knowledge of the applicable regulations; his reliance on HRS § 103D–701 was sufficient to make his execution of the Ameritech contract reasonable. We disagree. First, by virtue of his position as the head of a purchasing agency with authority to enter contracts, Kane is certainly chargeable with knowledge of the regulations applicable to public procurement. Second, Kane had actual knowledge of those regulations. His initial denial of CARL's protest cited, as its basis, a regulation in the same subchapter as HAR § 3–126–8. Third, Kane could not rely on the finality of his decision under HRS § 103D–701(e), inasmuch as his denial of the protest was in violation of HRS § 103D–701(c), given his failure to inform CARL of its right to review.

The record, therefore, not only belies the findings that Kane's execution of the contract was "not unreasonable"; it demonstrates bad faith. HAR § 3–126–36(c) (1995) provides in pertinent part that "[s]pecific findings of reckless disregard of clearly applicable laws or rules must support a finding of bad faith."[20] Once CARL's timely protest

---

20. Because bad faith requires a factual finding, it is generally determined by the trier of fact, rather than the appellate court. In this case, however, bad faith can be ascertained from the record. *See, e.g., Enos v. Pacific Transfer & Warehouse, Inc.,* 79 Hawai'i 452, 459, 903 P.2d 1273, 1280 (1995) (reviewing entire record where trial court's sanction order did not contain specific findings of bad faith conduct). Morever, under the circumstances of this case, the Hearings Officer is in no better position than this court to determine whether Kane acted in bad faith. Kane did not testify at the hearing, and, therefore, any finding by the Hearings Officer regarding his state of mind would have to be based on record, rather than on Kane's testimony, demeanor, and credibility.

was filed, and during its pendency, Kane was prohibited by the Code and its implementing regulations from executing the contract until the chief procurement officer made a written "substantial interest" determination. Kane was certainly aware of HRS § 103D–701(f) and was specifically informed by Unebasami that, pursuant to HAR § 3–126–6, the Library was not to award the contract during the pendency of the protest. Kane's disregard of the mandate of clearly applicable law, as well as the specific directions of Unebasami, was, at best, reckless. In his zeal to have the project completed before the end of the legislative session, Kane prematurely awarded the contract in violation of law, effectively restricting CARL's opportunity to participate in a fair solicitation should it prevail on its protest. We therefore hold that Kane's conduct was in bad faith.

### 2. *"Substantial Interest" Determination*

No written determination that would even arguably meet the requirements of HRS § 103D–701(f) was made until March 13, 1996. In its entirety, the written determination consisted of a statement by the Administrator of the State Procurement Office, Unebasami, in a memo to Kane, that "[p]ursuant to Section 103D–701(f) and based upon our review, it has been determined that the award of the contract to Ameritech without delay is necessary to protect the substantial interests of the State."

With respect to this written "substantial interest determination," the Hearings Officer concluded that "[t]he determination that substantial State interests were involved allowed [the Library] and [Ameritech] to proceed under the Contract despite the pendency of [CARL's] protests." COL 23. COL 23 is "in violation of . . . statutory provisions." HRS § 103D–710(e)(1). A determination that substantial State interests were "involved" is not sufficient, under the plain language of HRS § 103D–701(f), to allow the Library to proceed with the contract despite CARL's protest. Not only must substantial State interests be "involved," but the delay required to resolve the solicitation protest must threaten to impair those interests such that "award of the contract without delay is *necessary to*

*protect*" them. HRS § 103D–701(f) (emphasis added).

■ The Hearings Officer also concluded that

24. [CARL] did not meet its burden of proving by a preponderance of evidence that the CPO's decision of March 13, 1996, finding that the award of the Contract to [Ameritech] without delay was necessary to protect the substantial interests of the State despite [CARL's] protest was in violation of the law or violated the Constitution, statutes, regulations, or the terms and conditions of the solicitation.

The only FOF relevant to COL 24 referred to Kane's February 6 and 16 memos to Unebasami, reciting the arguments made therein. The Hearings Officer also found that:

276. By memorandum to Mr. Kane dated March 13, 1996, the CPO determined that the award of the Contract to [Ameritech] without delay was necessary to protect the substantial interests of the State.

To the extent that the Hearings Officer found that Unebasami was the "Chief Procurement Officer" with authority to make the substantial interest determination pursuant to HRS § 103D–701(f), we hold that finding is clearly erroneous, and COL 24 is, therefore, "wrong."

HRS § 103D–203 provides in pertinent part that:

The chief procurement officer for each of the following state entities and the several counties shall be:

. . . .

(7) The department of education—the superintendent of education; and

(8) The remaining departments of the executive branch of the State and all governmental bodies administratively attached to them—the administrator of the procurement office of the department of accounting and general services.

HRS § 103D–204 establishes the office of the administrator of the procurement office and provides that "[t]he administrator shall be the chief procurement officer for the governmental bodies of the executive branch *other than the University of Hawaii and the de-*

*partment of education, and those governmental bodies administratively attached thereto."* (Emphasis added.) Responsibility for operating the Library ultimately rests with the Board of Education, but the Library is administratively attached to the department of education. *See* 1981 Haw. Sess. L. Act 150, § 7 at 300–04 (transferring responsibility for operation of library system from Department of Education to Board of Education through State Librarian); *but see* Hse. Conf. Comm. Rep. No. 20, in 1981 House Journal, at 905–06 ("Through this bill, the public library system is hereby placed under the sole and direct control of the Board of Education, to be administered by the State Librarian, *and is placed in the Department of Education for administrative purposes only."* (Emphasis added.)).

Therefore, Unebasami, the administrator of the State Procurement Office, was not authorized to make the substantial interest determination in this case, and his March 13, 1996 memo to Kane did not satisfy the requirement of HRS § 103D–701(f). Nowhere in the record is there evidence that there was a proper substantial interest determination made by the Superintendent of Education; thus, the Library's continued work on the contract, as well as the January 25 execution of the contract, was in violation of HRS § 103D–701(f).[21]

Moreover, COL 24 is wrong for substantive, as well as procedural, reasons. Even if Unebasami had been authorized to make the "substantial interest" determination, his written determination failed to identify, and the Hearings Officer failed to make findings regarding, the State interests implicated and how those interests would be impaired by delay.

The general rule established by HRS § 103D–701(f) is that a timely protest halts

solicitation and contract activities until the protest is resolved. By maintaining the status quo during the pendency of a protest, violations of the procurement code can be rectified before the work on the contract has proceeded so far that effective remedies, for the protestor and the public, are precluded by expense and impracticality.

Because the Code both shortens deadlines for filing protests and applications for review and expedites the administrative hearings process, the delay contemplated is minimal, generally a few months.[22] There are, however, situations where a delay of several months before a contract may be awarded would have serious repercussions on the continuation of essential State functions. It is in these situations that the solicitation or award is allowed to proceed, upon a written determination that "the award of the contract without delay is necessary to protect the substantial interests of the State." HRS § 103D–701(f).

As the commentary to ABA Model Code § 9–101, which is substantively identical to HRS § 103D–701(f), explains:

> In general, the filing of a protest should halt the procurement until the controversy is resolved. *In order to allow essential governmental functions to continue,* Subsection (6) provides that the [State] may proceed with the solicitation or award of the contract, despite the protest, upon a determination in writing by the Chief Procurement Officer or the head of the Purchasing Agency that such action is necessary. It is expected that such a determination will occur only in those few circumstances where it is necessary to protect a substantial interest of the [State].

(Emphasis added.)

The Hearings Officer apparently found that Unebasami's determination was based

---

21. Kane's February 6 and 16, 1996 letters to Unebasami, urging him to issue a written substantial interest determination pursuant to HAR § 3–126–5, were characterized by Kane as "Request[s] to Award Contract to Ameritech[.]" Where the contract to Ameritech had already been executed in violation of HRS § 103D–701(f), a subsequent substantial interest determination, even one conforming to the requirements of the statute, could not retroactively cure the initial violation.

22. An application for review of the Hearings Officer's decision in this court obviously increases the potential delay before a final decision is reached, but the pendency of an application for review, in itself, does not delay further action with respect to the contract. *See* HRS § 103D–710(b) ("[a]n application for judicial review shall not operate as a stay of the decision rendered under section 103D–709").

on Kane's February 6 and 16 memos, but failed to enter any FOF or COL that the interests cited therein were "substantial" and would be harmed by delay on the contract.

■ Unebasami's March 13, 1996 letter to Harris certainly suggests that he relied more on Kane's assessment of the merits of CARL's protest than on any evaluation of the impact on State interests. Although the merits of CARL's protest is a necessary and proper basis for Kane's decision under subsection 701(c), consideration of the merits of CARL's protest has no place in the "substantial interest" determination required by subsection 701(f). Indeed, if the contracting officials could both deny the protest and authorize performance of the contract based on their assessment of the merits, subsection 701(f) would be meaningless. Moreover, if an erroneous assessment of the merits of the protest by the contracting officials could result not only in denial of the protest, but also in the elimination of any remedy because the contract has been awarded and performed based on that same assessment, there would be little purpose served by review of the decision as provided for in HRS §§ 103D–709 and 103D–710.

■ To the extent that the substantial interest determination was based on an assessment of the merits of CARL's protest, we hold that it was improper and did not satisfy HRS § 103D–701(f). To the extent that Unebasami relied on the interests cited in Kane's February 6 memo, we hold that CARL met its burden of proving by a preponderance of the evidence that continued performance on the contract pending resolution of its protest was not necessary to protect substantial State interests.

Kane's memo argued that the contract with the current vendor, DRA, had expired on June 30, 1995 and that service could terminate at any time, without significant notice, thereby adversely impacting library operations. The complete cessation of library automation services is the only argument advanced by Kane that even approaches impairment of a substantial State interest requiring award of the contract without delay. The record, however, shows by a preponderance of the evidence that performance of the

Ameritech contract without delay was not necessary to maintain library automation services. Keith Fujio, who was employed by the Library as the Director of the Management Information Branch and the Administrative Services Officer, with responsibility for administration of contracts, all purchases, and payroll, was called as a witness by the Library. On cross-examination by CARL, he testified that his staff had communicated with DRA "and the indication we were given [was that,] because of all these subsequent problems that arose, they would still support us on a month-to-month extension agreement." He further testified that the maintenance contract with DRA renews automatically from year to year if both parties agree to all the terms and that his understanding was that DRA was willing to continue providing services under its contract until the protest was resolved and a new vendor commenced providing services. Fujio's testimony was undisputed.

Therefore, although the State may have a substantial interest in continuing library automation services, award of the contract to Ameritech without delay was not necessary to protect that interest, and CARL proved as much by a preponderance of the evidence. The rest of Kane's memo to Unebasami merely describes how the library would be inconvenienced by maintaining the status quo during any delay in performing the contract and identifies no substantial interest of the State that would suffer.

■ Accordingly, we hold that COL 24 is wrong and that the award of and performance on the Ameritech contract was in violation of HRS § 103D–701(f). We further hold that a "substantial interest determination," pursuant to HRS § 103D–701(f), must specifically identify the State interests involved and articulate why it is necessary for the protection of those interests that the contract be awarded without delay.

### C. Jurisdiction to Impose Remedies

The Hearings Officer concluded that "[t]he scope of the Hearings Officer's ability to fashion a remedy in the instant case is governed by section 103D–707, concerning reme-

dies after an award." COL 22; *see also* COL 25 & 27. The Hearings Officer also concluded that, in order to determine whether the contract should be ratified or terminated pursuant to HRS § 103D–707, the best interests of the State must be considered. COL 26. Finally, the Hearings Officer concluded that he was without authority to determine the best interests of the State and that, therefore, should he conclude that the award of the contract was in violation of law, he was required to remand the matter back to the contracting officer to make this determination and to decide whether to ratify or terminate the contract. COL 28–30.

The conclusion that a remand was necessary was based on HAR § 3–126–38(1), which provides:

Upon finding after award that a state or county employee has made an unauthorized award of a contract or that a solicitation or contract award is otherwise in violation of law where there is no finding of fraud or bad faith, *the chief procurement officer or the head of a purchasing agency* may ratify or affirm the contract or terminate it in accordance with this section after consultation with the respective attorney general or corporation counsel, as applicable.

(Emphasis added.) The Hearings Officer's interpretation of the regulation is incorrect and leads to the absurd result that, where the head of a purchasing agency has awarded a contract in violation of law, even if the action was in bad faith, he or she has exclusive jurisdiction to fashion the remedy for his or her own wrongdoing. The Procurement Code has already been declawed by the addition of the "exclusive remedy" provision, HRS § 103D–704; the Hearings Officer's interpretation of HAR § 3–126–38 would render it toothless as well.

Neither the language of HRS §§ 103D–705 to 103D–707 nor the language of HAR 3–126–38(1), however, requires that interpretation. HRS § 103D–705 provides that the remedy provisions, HRS §§ 103D–706 and 707, apply where it is determined administratively, either by the head of the purchasing agency, pursuant to HRS § 103D–701, or by the Hearings Officer, pursuant to HRS § 103D–709, or judicially, pursuant to HRS § 103D–710, that the solicitation or award of a contract is in violation of law. HRS § 103D–707 provides that, where that determination is made after an award, the contract may be ratified or terminated.

▪ By its plain language, HAR § 3–126–38(1) clearly applies only where the head of the purchasing agency or the chief procurement officer finds, pursuant to HRS § 103D–701, that the protested solicitation or award was in violation of law: "Upon finding after award [that the solicitation or award is in violation of law,] the chief procurement officer or the head of a purchasing agency may [ratify or terminate the contract]." Where the chief procurement officer or head of a purchasing agency finds that there was *no* violation of law, and, after de novo review, pursuant to HRS § 103D–709, a Hearings Officer finds otherwise, HAR § 3–126–38 has no application. In that case, by a common sense reading of HRS §§ 103D–705 and 103D–707, it is incumbent upon the Hearings Officer to determine whether to ratify or terminate the contract.

▪ We hold, therefore, that COL 28 and 29 are wrong and vacate that part of the August 15, 1996 order remanding the case to the Library to "ratify and affirm the contract, or terminate the contract as provided for in HRS § 103D–707(1)(A) and (B)." We instead remand to the Hearings Officer to make that determination. Although the Hearings Officer may consider the factors enumerated in HAR 3–126–38(4), *supra*, those factors are not the exclusive determinants of "the best interests of the State." To determine whether the ratification of an unlawfully awarded contract is in the State's best interests, consideration must also be given to the State's interest in achieving the purposes of the procurement code, which are revealed by its legislative history:

The purpose of this bill is to revise, strengthen, and clarify Hawaii's laws governing procurement of goods and services and construction of public works.

Specifically, the bill establishes a new comprehensive code that will:

(1) Provide for fair and equitable treatment of all persons dealing with the government procurement system;

(2) Foster broad-based competition among vendors while ensuring accountability, fiscal responsibility, and efficiency in the procurement process; and

(3) Increase public confidence in the integrity of the system.

Sen. Stand. Comm. Rep. No. S8–93, in 1993 Senate Journal, at 39.

As the Supreme Court of New Mexico explained in *Planning & Design Solutions v. City of Santa Fe*, 118 N.M. 707, 885 P.2d 628 (1994):

The purposes of the Procurement Code are to provide for the fair and equitable treatment of all persons involved in public procurement, to maximize the purchasing value of public funds and to provide safeguards for maintaining a procurement system of quality and integrity. Of all the interests involved in competitive bidding, the public interest is the most important. An economical and efficient system of procurement directly benefits taxpayers.... It is certainly in the public interest that the [State] abide by the procurement rules it has set for itself.

*Id.* at 710, 885 P.2d at 631 (citations and internal quotation marks omitted). The public interest in the integrity of the procurement code cannot be ignored when determining whether it is in the best interests of the State to ratify an unlawfully awarded contract.[23]

D. *CARL is Entitled to its Costs and Attorneys' Fees*

We agree with the Library and Ameritech that CARL is not entitled to the remedy it seeks—recission of the contract with Ameritech and award of the contract to CARL. However, we agree with CARL that it may recover its costs of preparing its proposal and its attorneys' fees incurred in its protest.

1. *CARL may recover its bid preparation costs pursuant to HRS § 103D–701(g).*

In concluding that his authority to fashion a remedy was limited to HRS § 103D–707, the Hearings Officer did not consider HRS § 103D–701(g), which provides:

In addition to any other relief, when a protest is sustained and the protesting bidder or offeror should have been awarded the contract under the solicitation but is not, then the protesting bidder or offeror shall be entitled to the reasonable costs incurred in connection with the solicitation, including bid preparation costs other than attorney's fees.

Although this provision is contained in the subsection governing initial agency review and not in HRS § 103D–709, which governs review by the Hearings Officer, hearings officers have jurisdiction to review determinations made pursuant to HRS § 103D–701 *de novo.* HRS § 103D–709(a). Therefore, hearings officers have jurisdiction and authority to act on protested solicitations and awards in the same manner and to the same extent as contracting officials authorized to resolve protests under HRS § 103D–701.

By its express terms, a protesting bidder is entitled to recover its bid preparation costs pursuant to HRS § 103D–701(g) if: (1) the protest is sustained; (2) the protestor should have been awarded the contract; and (3) the protestor is not awarded the contract. It is implicit in the provision that it applies only in those cases where the contract has been awarded before the resolution of the protest. Were this not the case, a determination that a protestor "should have been awarded the contract under the solicitation but is not" would be premature and nonsensical because, in the typical protest, pursuant to HRS §§ 103D–701(f) and 103D–709(e), the award of the contract does not occur until after the protest is finally resolved by a hearings officer.

23. On remand, the Hearings Officer may also consider whether the contract with Ameritech satisfies the standard delineated in *Konno v. County of Hawai'i*, 85 Hawai'i 61, 937 P.2d 397 (1997) (holding that privatization of worker positions within the civil service system, which encompasses those services that have been customarily and historically provided by civil servants, violates constitutionally mandated merit principles and civil service statutes), an issue that is not before this court and upon which we express no opinion.

In this case, only two of the three express requirements of HRS § 103D–701(g) were satisfied: CARL's protest was sustained, and CARL was not awarded the contract. There was no determination, however, of whether CARL "should have been awarded the contract[.]"

CARL proposed three separate and distinct bases upon which it contends that it should have been awarded the contract: (1) Ameritech's proposal contained material deviations from the RFP and, therefore, was not responsive to the RFP, leaving CARL as the only responsive offeror; (2) Ameritech should have been precluded from submitting an offer pursuant to HRS § 103D–405(d) and HAR § 3–122–13(e), again leaving CARL as the sole remaining and responsive offeror; and (3) after taking into account the price and the evaluation factors contained in the RFP, CARL's proposal was the most advantageous to the State, and, therefore, CARL should have been awarded the contract.

The Hearings Officer, however, did not address CARL's first two contentions in his FOF, COL, and Order; with respect to the third—that CARL's proposal, when properly evaluated, was the most advantageous to the State—the Hearings Officer concluded that "the entire evaluation process" was so "irretrievably flawed" that it could not be used to determine who should have been awarded the contract. Therefore, the Hearings Officer did not, and could not, determine whether CARL "should have been awarded the contract under the solicitation," but, rather, ordered the Library to reevaluate the proposals on remand.

Obviously, neither the Hearings Officer nor this court has the technical qualifications to conduct an independent evaluation of the proposals and to determine, based on their relative merits in comparison with the requirements of the RFP, which proposal was most advantageous to the State. However, as discussed in section II. A., *supra*, the Hearings Officer was without statutory authority to remand to the Library for a reevaluation. The only way it could be determined,

at this point, whether CARL "should have been awarded the contract" would be for this court to remand to the Library for reevaluation for the sole purpose of determining CARL's entitlement to bid preparation costs. On the facts of this case, such a remand would, we believe, be a futile exercise.

The Library, in response to CARL's protest, denied that the evaluation in any way failed to comply with the procurement code. It vigorously defended that position before the Hearings Officer, and, on appeal, continues to maintain that Ameritech was properly awarded the contract. More significantly, the matter *was* remanded to the Library for reevaluation, albeit improperly, almost a year ago; there is no indication, however, that the Library has complied with the Hearings Officer's order to properly evaluate the proposals.[24] Finally, the Library has already demonstrated bad faith in its handling of CARL's protest.

██ Requiring a determination that the protestor should have been awarded the contract, where the evaluation was so fundamentally flawed that the results are invalid and the required determination cannot be made, unfairly punishes the successful protestor. In *Paul Sardella Construction Company, Inc. v. Braintree Housing Authority*, 3 Mass. App.Ct. 326, 329 N.E.2d 762 (1975), *aff'd*, 371 Mass. 235, 356 N.E.2d 249 (1976), the Massachusetts Appeals Court explained that:

> The "honest and open procedure for competition" among the various bidders that is one of the fundamental objectives of the competitive bidding statute must necessarily entail fair consideration of all the submitted bids in accordance with the applicable sections of the statute. We hold that where such consideration has not been given by public contracting authorities, in violation of statutory provisions, the proper measure of recovery is the reasonable cost of preparing the bid.
>
> . . . .
>
> The award of reasonable bid preparation costs for the failure to give fair consider-

---

24. The pendency of CARL's appeal to this court does not excuse the Library's failure to reevaluate the proposals because "[a]n application for

judicial review shall not operate as a stay of the decision rendered under section 103D–709." HRS § 103D–710(b).

ation to a bidder in accordance with the statutory procedure will best effectuate the legislative objectives underlying the statute by insuring the widest competition among responsible bidders. Notwithstanding possible short-term benefit to an awarding authority in a particular case through violation of the statute, over the longer term harm to the public interest would ensue if awarding authorities are not to be held accountable for their violations. The number of bidders, and thus the range of choice available to an awarding authority, may well be reduced if it were to be assumed by prospective bidders that such an authority would not abide by the applicable statutes in making its awards.

*Id.*, 329 N.E.2d at 766–67. We agree and, accordingly, hold that, where the evaluation is so fundamentally flawed that the determination of who should have been awarded the contract was not, and cannot be, made,[25] and the contract has already been awarded in bad faith and in violation of HRS § 103D–701(f), a successful protestor who was not awarded the contract is entitled to recover its bid preparation costs pursuant to HRS 103D–701(g).

In this case, the Hearings Officer concluded that "the evaluation process and the concomitant award of the contract to [Ameritech], did not comply with HRS § 103D–303(g)[,]" COL 34, because CARL's proposal "did not receive a complete evaluation in comparison with [Ameritech.]" Because "the entire evaluation process" was "irretrievably flawed," it could not be determined whether CARL should have been awarded the contract. CARL prevailed in its protest and was not awarded the contract; the contract was awarded to Ameritech in bad-faith violation of HRS § 103D–701(f). Therefore, we hold that CARL is entitled to recover its bid preparation costs, which the Hearings Officer

found to be approximately $30,000.00. FOF 169.

### 2. *Carl may recover its attorneys' fees incurred in the protest.*

CARL contends that it is also entitled to an award of its attorneys' fees and costs incurred both in the protest hearing and in this judicial review, "given HS[P]LS's and Kane's misconduct and attempt to deny CARL its rights to a fair and equitable bidding process and a full and fair hearing." Neither the Library nor Ameritech disputes CARL's entitlement to attorneys' fees in their briefs. Because nothing in the procurement code precludes an award of attorney's fees to a successful protestor, and, under the circumstances of this case, requiring CARL to bear the fees incurred in its protest would undermine the purposes of the Code, we agree with CARL.

The only mention of attorney's fees in the relevant sections of the Code is found in HRS § 103D–701(g), which provides in part that "the protesting bidder or offeror shall be entitled to the reasonable costs incurred in connection with the solicitation, including bid preparation costs other than attorney's fees." The placement of the provision in section 701, which defines the authority of the head of the purchasing agency or chief procurement officer to resolve protested solicitations, as well as the plain language—"costs in connection with the solicitation, including bid preparation costs other than attorney's fees"—demonstrate that the provision has no applicability to this court's authority to award attorney's fees incurred in the protest. The provision, by its clear and unambiguous terms, refers to attorney's fees incurred in the *solicitation*, not the *protest*,[26] and is a restriction on the authority of the head of the purchasing agency and the chief procurement officer.

---

**25.** We note that our holding would not apply where the flaw in the evaluation is one that can be retroactively corrected by the Hearings Officer, such as an inadvertent mathematical error requiring only recalculation.

**26.** At the point in the protest at which the 701(g) determination is made, there will, in most cases, have been very little, if any, attorney involve-

ment. The protest to the agency consists of a letter setting forth the information enumerated in HAR § 3–126–3, a response to any request for information made by the agency pursuant to HAR § 3–126–4, and, in some cases, a request for reconsideration of the agency's decision pursuant to HAR § 3–126–8.

Nowhere in the Code is the award of attorney's fees incurred in a protest expressly prohibited. Arguably, however, such an award is implicitly prohibited by HRS § 103D–704, which provides:

The procedures and remedies provided in this part, and the rules adopted by the policy office, shall be the exclusive means available for persons aggrieved in connection with the solicitation or award of a contract, a suspension or debarment proceeding, or in connection with a contract controversy, to resolve their claims and differences. The contested case proceedings set out in chapter 91 shall not apply to protested solicitations and awards, debarments or suspensions, or the resolution of contract controversies.

We have often stated that:

In construing statutes, a court's primary objective is to ascertain and give effect to the intention of the legislature as gleaned primarily from the language contained in the statute itself.... Accordingly, "[i]t is well settled that this court is bound by the plain, clear and unambiguous language of a statute unless the literal construction would produce an absurd and unjust result, and would be clearly inconsistent with the purposes and policies of the statutes."... The foregoing does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review.... Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Survivors of Medeiros v. Maui Land & Pineapple Co.,* 66 Haw. 290, 297, 660 P.2d 1316, 1321 (1983) (citations omitted); *see also Konno,* 85 Hawai'i at 71, 937 P.2d at 407; *Shipley v. Ala Moana Hotel,* 83 Hawai'i 361, 365, 926 P.2d 1284, 1288 (1996); *Bragg v. State Farm Mut. Auto. Ins. Co.,* 81 Hawai'i 302, 306, 916 P.2d 1203, 1207 (1996); *Sato v. Tawata,* 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995). We believe that a literal construction

of HRS § 103D–704, on the facts of this case, produces an unjust result, inconsistent with the policies of the procurement code.

The procurement code was enacted in an attempt to address real problems making daily headlines. The Code prescribes strict procedures for the procurement of goods and services by State agencies, for the purposes of: (1) providing fair and equitable treatment of all persons dealing with the government procurement system; (2) fostering broad-based competition among vendors while ensuring accountability, fiscal responsibility, and efficiency; and (3) increasing public confidence in the integrity of the system.

There are only two mechanisms for enforcing the provisions of the code. Intentional violation of its provisions by "any person" is a misdemeanor, and in addition to the applicable criminal penalty, the violator is subject to removal from office and liable to the State for its costs incurred. HRS § 103D–106. Enforcement under this provision, like any criminal statute, is at the discretion of the prosecutor.

The other enforcement mechanism is through protests by aggrieved participants in the process. The remedies available when a protest is sustained are limited; generally the solicitation must be canceled or revised to comply with the Code. In either case, though, the successful protestor has the "remedy" of an opportunity to participate in a fair procurement process and be awarded the contract if its bid or offer is the most advantageous to the State.

Where, however, the contract has been awarded before the protest is decided, there is no "remedy" for the protestor who has proven that the process was in violation of the Code. After the award of the contract, the contract can only be ratified or terminated, with the relevant factors favoring ratification in direct relation to the progress made towards completion of the contract. Although ratification or termination of a contract found to have been awarded in violation of the Code may vindicate the public's interest in the integrity of the procurement process, neither "remedy" affords the protestor the opportunity to be awarded the contract based on the merits of its proposal. Thus, it

is not the exclusive remedy provision of the Code that deprives a protestor of meaningful relief; in this case, CARL's lack of a remedy stems from Kane's unilateral, bad-faith, decision to award the contract to Ameritech in violation of HRS § 103D–701(f).

The Code itself thus contains an inherent incentive for an agency to award the contract immediately upon receipt of a protest: it can avoid the delay and expense that would be incurred in the cancellation and resolicitation should the protestor prevail. In addition, there is a built-in disincentive for an aggrieved participant to pursue a protest past the agency stage once the contract has been awarded: regardless of whether it is successful in proving a violation of the code, and no matter how egregious the violation, the only potential relief available to the protestor is recovery of its bid preparation costs. Requiring such a protestor to bear its own attorney's fees strengthens the financial disincentive to pursue a protest once the contract has been awarded, and essentially nullifies the most effective enforcement mechanism in the Code.

In the long term, this can only decrease competition among vendors. Moreover, if the procedural provisions of the Code are unenforceable except at the discretion of the prosecutor, the Code cannot "[i]ncrease public confidence in the integrity of the system" or, as it demonstrably failed to do in the instant case, "[p]rovide for fair and equitable treatment of all persons dealing with the government procurement system." Although the Code does not expressly authorize the award of attorney's fees under the circumstances of the instant case, interpreting HRS § 103D–704 to preclude such an award renders the Code incapable of furthering the purposes and policies that required its enactment.

We do not believe that the legislature intended this result. The remedy provisions of the procurement code were intended to encourage the settlement of disputes "through administrative processes to save time and expense for both parties *while preserving all rights and maintaining fairness.*" Sen. Stand. Comm. Rep. No. S8–93, in 1993 Senate Journal, at 39 (emphasis added). Fair-

ness is not maintained, however, by shifting the economic burden of enforcing the Code to a protestor, who, because of bad-faith actions of the contracting official, has been deprived of any means of being made whole following fruitless participation in an unlawfully conducted procurement process.

Although the Code specifically addresses the appropriate remedy when the vendor awarded the contract acts fraudulently or in bad faith, HRS § 103D–707(2), it does not appear that the legislature contemplated a purchasing agency's bad-faith violation of the procedural requirements designed to promote fairness and public confidence in the integrity of the procurement code. We have held that, "[a]mong courts' inherent powers are the powers to create a remedy for a wrong even in the absence of specific statutory remedies, and to prevent unfair results." *Richardson v. Sport Shinko (Waikiki Corporation)*, 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994) (citations omitted). This inherent power is codified in HRS § 602–5(7), which acknowledges this court's jurisdiction and power "[t]o make and award such judgments, decrees, orders and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to it by law *or for the promotion of justice in matters pending before it.*" (Emphasis added.)

■ Accordingly, because the legislature has failed to provide any statutory remedy for bad faith conduct on the part of the purchasing agency, and because requiring the protestor to bear the financial burden of enforcing the Code under these circumstances undermines the purposes of the Code, we hold that a protestor is entitled to recover its attorney's fees incurred in prosecuting its protest if: (1) the protestor has proven that the solicitation was in violation of the Code; (2) the contract was awarded in violation of HRS § 103D–701(f); and (3) the award of the contract was in bad faith. *See, e.g., Bolander & Sons v. City of Minneapolis,* 438 N.W.2d 735, 738–39 (Minn.Ct.App.1989) (holding that where the contract is currently being performed, the successful protestor is entitled to its costs in preparing its unsuc-

cessful bid and its expenses, including attorney's fees), *aff'd,* 451 N.W.2d 204 (Minn. 1990).

### III. *CONCLUSION*

For the reasons stated above, we vacate the Hearings Officer's August 15, 1996 Order that "the proposals submitted by [Ameritech] and [CARL] in response to RFP–96–4 be remanded back to [the Library] for proper evaluation, after which [the Library] shall ratify and affirm the contract, or terminate the contract as provided for in HRS § 103D–707(1)(A) and (B)."

We remand to the Hearings Officer for any necessary further hearings, followed by entry of an order (1) awarding CARL its costs of preparing its proposal in response to RFP 96–4, and its reasonable attorney's fees in prosecuting its protest and appeal; and (2) ratifying or terminating the contract as provided for in HRS § 103D–707.

RAMIL, Justice, concurring and dissenting, with whom NAKAYAMA, Justice, joins.

I concur in the opinion except with respect to part II.D.2, in which the majority awards CARL its reasonable attorneys' fees in prosecuting its protest and appeal. Both the Code and our precedent fail to provide for such a remedy.

It is well-settled that "no attorney's fees may be awarded as damages or costs unless so provided by statute, stipulation, or agreement." *Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.,* 58 Haw. 606, 618, 575 P.2d 869, 878 (1978).

Hawai'i follows the traditional American rule that ordinarily attorney's fees cannot be awarded as damages or costs where not so provided by statute, stipulation or agreement.... This traditional American rule requires the litigant for whom legal services are rendered to assume the burden of paying for those services. Thus, ordinarily counsel fees are not recoverable against the losing party in the absence of statute, agreement or stipulation authorizing the allowance thereof. *Olokele Sugar Co. v. McCabe, Hamilton & Renny Co.,* 53

Haw. 69, 487 P.2d 769 (1971); *Berkness v. Haw'n Elec. Co.,* 51 Haw. 437, 462 P.2d 196 (1969); *Chun v. Park,* 51 Haw. 462, 462 P.2d 905 (1969); *Estate of Campbell,* 46 Haw. 475, 382 P.2d 920 (1963); *Yokochi v. Yoshimoto,* 44 Haw. 297, 353 P.2d 820 (1960); *Von Holt v. Izumo Taisha Kyo Mission,* 44 Haw. 147, 355 P.2d 40 (1960), *aff'd,* 44 Haw. 365, 355 P.2d 40 (1960); *Welsh v. Campbell,* 42 Haw. 490 (1958); *Bishop Trust Co. v. Cooke Trust Co.,* 39 Haw. 641 (1953). This rule was equally applicable whether the pending controversy was at law or in equity. *Dress Mfg. Co. v. Cadinha,* 33 Haw. 456 (1935); and *Young Chun v. Robinson,* 21 Haw. 368 (1912).

*Shoemaker v. Takai,* 57 Haw. 599, 604, 561 P.2d 1286, 1289 (1977) (internal quotation marks omitted). *See also THC Financial Corp. By and Through Osborne v. LR & I Development One,* 65 Haw. 477, 653 P.2d 789 (1982); *Cain v. Cain,* 59 Haw. 32, 42, 575 P.2d 468, 476 (1978); *Salvador v. Popaa,* 56 Haw. 111, 530 P.2d 7 (1974); *Brown v. Tokuda,* 49 Haw. 311, 417 P.2d 636 (1966). For over eighty years, the law has been consistent on this issue, and I see no compelling reason set forth by the majority for changing this precedent.

The Code does not authorize the recovery of CARL's attorneys' fees, nor is there evidence of a stipulation or other agreement that does so. Accordingly, I would decline to grant CARL's request for its attorneys' fees in prosecuting its protest and appeal because, on the record, there is no valid basis for their recovery.

As a court, our decisions relating to disputes governed by the application of statutory law ... must be based on that statutory law as it currently exists, and not on statutory law as it could be or even as it should be. The determination of what that law could be or should be is one that is properly left to the people, through their elected legislative representatives.

*Konno v. County of Hawai'i,* 85 Hawai'i 61, 79, 937 P.2d 397, 415, *as modified on recon-*

*sideration* (1997) (motion for reconsideration and order of amendment).